UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
DAVIS, ET. AL,

          Plaintiffs,

   - against -

THE PORT AUTHORITY OF NEW YORK
AND NEW JERSEY,

     Defendant,
------------------------------------------------------x

**MEMORANDUM AND ORDER**
14-CV-3259 (ILG) (SLT)

GLASSER, Senior United States District Judge:

Cathy Davis fell on a stairway at LaGuardia Airport ("LaGuardia"), which is operated by The Port Authority of New York and New Jersey ("Port Authority"). Ms. Davis and her husband brought an action for negligence and loss of consortium, respectively, against the Port Authority. Their contentions are, among others, that the Port Authority negligently failed to provide adequate crowd control, maintain safe premises, and warn about the presence of the stairway. The Port Authority has moved for summary judgment. For the reasons given below, the motion is GRANTED.

## BACKGROUND

After disembarking from a plane that arrived at LaGuardia's Central Terminal, Ms. Davis proceeded toward the concourse exit, which was reached through a corridor and stairway. *See* Davis Dep., Dkt. 31-3, at 46–50. That stairway is where Ms. Davis's injury occurred.

Airport crowd conditions were the focus of discovery. The Central Terminal is large, extending over several multistory buildings, and congestion varies substantially throughout the terminal. *See* Vero Dep., Dkt. 33-18, at 9, 33, 39–40; Rhoads Dep., Dkt. 31-8, at 11–16. Christopher Rhoads, a Port Authority employee responsible for monitoring airport service

conditions, testified that congestion occurs "almost exclusively" at those areas in the terminal where passengers congregate to await instructions for boarding their planes. Rhoads Dep. at 36; *see also id.* at 37–39. Areas of the terminal where passengers arrive, by contrast, are substantially less crowded, for the reason that arriving passengers don't congregate; they simply proceed to retrieve their luggage, if any, and leave the building. *Id.* at 36–39, 54, 58, 60.

The exit corridor and stairway do not have a history of crowd congestion. *Id.* at 17, 40, 63, 99; *see also* Vero Dep. at 86, 88–89. In the past five years, there was only one reported accident of unknown cause in that area. *See* Patron Accident Reports, Dkt. 33-15, at 13. Aware of the necessity of providing safe means for passenger movement throughout the terminal, the Port Authority employs crowd-control personnel who are assigned, as required, by observation of "passenger behavior and congestion," "trends," records, and identifiable patterns of accidents. Rhoads Dep. at 99; *see id.* at 62–64, 75–76, 91, 99–102. Congestion at the stairway in question had never been a concern that made crowd control necessary. *See id.* at 99–100.

Rhoads testified that the arriving flight schedule at the time of this occurrence, noon on January 9, was ordinary and should not have caused overcrowding. *Id.* at 24, 26, 47–53, 62, 87–89. The ambiguous and inconsistent account of the event given by the plaintiff would compel the conclusion that, at the time of her fall, there were many people in the corridor leading to the stairway, but not sardine-like overcrowding to a suffocating density. Ms. Davis testified, for example, that the corridor was "full of people" (Davis Dep. at 130); that the crowd "pressed up against" and "pushed her;"[1] that "we were very close to each other (*id.* at 59);" and that "there

---

[1] Pl's Response to Interrogatories, Dkt. 33-16, at 5–6. It should be noted that although Davis wrote, in response to interrogatories, that the crowd "pressed up against" and "pushed her" (*id.*), she has repudiated that claim. *See generally Telfeyan v. City of New York*, 40 A.D.3d 372, 372–73 (1st Dep't 2007). During her deposition, when asked whether she was touched, bumped, or pushed, Davis was nonresponsive. *See* Davis Dep. at 59, 129. Her Rule 56.1 statement simply states that she "could not get out of the way of the people behind her." Dkt. 33-1, ¶ 18. Her expert opined that she was "not pushed or shoved"—just "pressured by their proximity" (Dkt. 33-21, at 7), though the precise meaning of that is elusive.

2

were people all around me. I [could] feel the heat from their bodies," (*id.* at 129). Of particular significance is her testimony that she was approximately two-feet or "three steps" behind her daughter, whom she saw descend the stairway. *Id.* at 59, 121. Davis further testified that she saw the stairs when she "got to the first step;" that she "had nowhere to go" and was "mowed down" by the people behind her (*id.* at 52); and that "mowed down" means, "[t]here was so many people. I had nowhere to go. I just went down . . . [I]t was either that or fall forward. I had to go down. There was no more room on the steps," (*id.* at 68). She "went down on [the] second step," where she fractured her ankle. *Id.* at 52; *see id.* at 76, 80.

## **DISCUSSION**

It is generally accepted as appropriate, if not required, in the determination of negligence cases, to scour the reports for cases which bear some similarity to the one at hand, cases in which someone claimed to be injured by a crowd—be it at a stadium, theater, airport, or department store—hopefully to find some quotable pronouncement for or against liability. That exercise in legal research is questionably useful. It produces a collection of cases in each of which a stage is set with different players, in different settings, and under different circumstances, but is claimed to be a transcript of the one at issue and decided for the result advocated. Eschewing a display of scholarship by a multiplicity of such citations, a resort to rudimentary principles will lead to the required determination of this case.

The law of negligence is frequently sought to be put in a nutshell by reciting "the risk reasonably to be perceived defines the duty to be obeyed," which generations of lawyers immediately recall as Judge Cardozo's formulation in *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 342 (1928). It has, however, appropriately been observed in another context, that it is one thing to put it in a nutshell and another thing to keep it there. *See* Leach, *Perpetuities in a*

*Nutshell*, 51 Harv. L. Rev. 638, 638 n. a1 (1938) (citing *Van Grutten v. Foxwell* [1897] A.C. 658, 671). A more prosaic but time-worn formulation of the elements of a cause of action for negligence may be of more assistance: there must be (1) a legal duty owed by the defendant to protect the plaintiff against an unreasonable risk of harm; (2) a breach of that duty—or, to put it differently, a failure to conform to the standard of conduct prescribed by law for the protection of the plaintiff; (3) a causal connection between the defendant's conduct and the plaintiff's injury; and (4) damages suffered by the plaintiff as a result of the defendant's conduct.

The Port Authority is not an insurer of the well-being of persons on its premises. It is not strictly liable, liable without fault, for any injury occurring there. Its liability is founded on blameworthiness. Holmes, *The Common Law*, at 108. The duty that the Port Authority owed Ms. Davis was to exercise ordinary care to avoid an injury to her. *See* Prosser & Keeton, *Law of Torts* § 34, at 209 (5th ed. 1984) ("What is required is merely the conduct of the reasonable person of ordinary prudence under the circumstances."). Put differently, the Port Authority owed Ms. Davis a degree of care commensurate with the risk reasonably to be perceived. That "risk" has been lucidly stated to be "[t]he possibility of an accident that is clear to the ordinarily prudent eye." *Munsey v. Webb*, 231 U.S. 150, 156 (1913) (Holmes, J.), adopted in *Palsgraf*, *supra*, at 344.

With these fundamental principles in mind, in what respect did the conduct of the Port Authority fall below the standard of care required to be exercised by a reasonable landowner? It is undisputed that just one untoward event of unknown cause was recorded at the place of injury within the preceding five years. And there is no evidence that the Port Authority was alerted to the congestion in that corridor at the time of the claimed injury. Given those circumstances, what risk would have been "clear to the ordinarily prudent eye" of the Port Authority? The

answer, I suggest, was provided with stunning eloquence in *Palsgraf*: "Life will have to be made over, and human nature transformed, before prevision so extravagant can be accepted as the norm of conduct, the customary standard to which behavior must conform." 248 N.Y. at 343.

It would be an affectation of research to adorn this opinion with a multiplicity of case citations and references to the many treatises on the law of torts to confirm the lessons in the common law of torts taught by Judge Cardozo in that case and others which are exquisitely applicable here. "Proof of negligence in the air, so to speak, will not do." *Martin v. Herzog*, 228 N.Y. 164, 170 (1920). "One who seeks redress at law does not make out a cause of action by showing without more that" she has sustained an injury. *Palsgraf*, 248 N.Y. at 345. Ms. Davis has sustained an injury, but not one for which the Port Authority is blameworthy. It is doubtful whether there is a causal connection between the flow of departing passengers in the corridor and her sprained ankle. But "[t]he law of causation remote or proximate, is . . . foreign to the case. The question of liability is always anterior to the question of the measure of the consequences that go with liability." *Id.* at 346. Given the absence of any evidence, or even any suggestion, that the Port Authority had notice of a risk of injury due to overcrowding at that time and place, it breached no duty it owed to Ms. Davis—that is to say, it was not negligent as to her.[2]

---

[2] Plaintiff's additional theories of liability are meritless and warrant little discussion. The stairway was not a hidden trap: undisputed evidence establishes that the stairs are visible from a distance of 60 feet and clearly to be seen; that three black lines on each step contrast with the color of the floor; and that an overhead sign contains a downward-pointing arrow indicating the existence of a stairway. Contrary to Plaintiffs' claim, the stairway, which complied with the building code, was not required to have a center handrail. *See Jung v. Kum Gang, Inc.*, 22 A.D.3d 441, 442 (2d Dep't 2005).

## **CONCLUSION**

The Port Authority's motion for summary judgment is GRANTED, and the complaint is dismissed.

SO ORDERED.

Dated:  Brooklyn, New York
        May 2, 2016

/s/
I. Leo Glasser